## IN THE MATTER OF SETTLEMENT OF M. E. CATOR, Executor of Bazil Berry, deceased.

1. ADMINISTRATOR. *When personally liable.* The principle on which an administrator is held personally responsible, is a want of due diligence, such as a prudent man would ordinarily exercise in his own affairs of like kind.

M. E. .Cator, Executor 'of Bazil Berry, deceased.

2. SAME. *Failure to sue.* An administrator will not be held liable be-- cause of his failure to bring suit, where the suit would be unsuc- cessful.

3. PRINCIPAL AND SURETY. *When surety discharged.* If the holder of a note surrenders to the maker collaterals, which were placed in his- hands by the maker, which were ample to indemnify him, the surety on the note is discharged.

## FROM WILLIAMSON.

Appeal in error from the Circuit Court· of Williamson county. W. S. McLEMORE, J.

BOND & FOWLKES for heirs.

DEMOSS & MALONE and R. M. EWING for executor.

FREEMAN, J., delivered the opinion of the court.

This is a case arising on a settlement of his ac-- counts by the executor of Bazil Berry, deceased, in the county court of Williamson, the case having been 'taken by appeal to the circuit court. There judg- ment was had against the executor on two items, from which he has appealed to this court. Cator appeals· because he is held liable for the uncollected balance· found remaining on a debt due his testator originally by note, of $5,092, made ·by A. G. & H. G. W. .Mayberry, said balance being at date of the judgment of the circuit court $3,046.63, and also because not ' allowed a credit for $207.86, with interest, amounting to $249.91.

As to the last item, the Referees report correctly,. the executor should not have been charged with it. · It was a fee for collecting and paying over upwards·

of $5,000 of this Mayberry note, about which the contest now is being had.

Whether the attorneys employed were the proper parties to be so employed or not, because also the attorneys of the administrator of A. G. Mayberry, who was principal in the note, still for beneficial services actually rendered, of which the estate received the proceeds, the heirs and distributees ought not to be permitted to take the benefits without bearing a proper and reasonable expense in obtaining it. The fee is shown to have been reasonable, the money collected, and paid over to the executor of Berry.

The question of liability for the uncollected balance on the note given by A. G. & H. G. W. Mayberry, depende substantially on the following state of facts: A. C. Mayberry, the principal, died October, 1868, with a large estate and large indebtedness; administration was granted to his co-maker of the note, H. G. W. Mayberry, in November after, who not long after suggested the insolvency of the estate to the county court, and in less than a year a bill was filed in the chancery court to transfer the administration to that court, which was done, and notice given to all creditors to file their claims. Berry, the testator, filed this note on March 1, 1870, with the clerk and master, in said cause himself, but filed no petition making himself party, nor did he take any further step to have himself made such. However, that administration proceeded regularly, or rather very irregularly, and the debt due Berry was reported by the clerk and master, and allowed as a claim against the

estate, no exceptions being filed to its allowance. In the meantime Berry died in 1871, and Cator became his executor. He employed the firm of Campbell, McEwen & Bullock to attend to the collection of this claim. They were at the same time the regular attorneys of the administrator of A. G. Mayberry, and representing him in the administration suit at the time the claim of Berry had been allowed by a decree confirming the report of the clerk and master made in April, 1871, Cator not proving the will until December 4, 1871. The duty of the executor and his attorneys then was to see to the collection of the claim, as it stood, allowed by the court. The attorneys, no doubt, assumed there was no litigation or contest between the administrator of A. G. Mayberry and the executor of Berry, and in fact there was none. The claim, as we have said, had been adjudged against the estate on a report of the clerk and master, which had been unexcepted to, and was conclusive against the administrator. In this aspect of the case there was no antagonism of interest between the administrator and the executor of Berry as to this claim. The only contest that could arise would have been with the heirs or distributees when assets, personal or not, were sought to be applied to the payment of the debt so allowed. No such contest was ever made however. They, as well as the other creditors of the estate, were in no condition to contest the claim itself, as they were all parties to the administration suit, and equally with the administrator concluded by this decree. There can then be

no liability against Cator, on the special facts stated, by reason of having employed this firm to represent him in the collection of this claim.

If the claim had not been allowed, and it had been shown that any failure to have it allowed, or to realize it after it had been allowed, had resulted by reason of antagonism between the two parties represented, then a different question might have been presented. But on the facts as we have stated them, there is no difficulty in saying there was no impropriety in the position of the attorneys in undertaking the collection of this debt for the executor, nor any wrong in his retention of the firm for this purpose. It is shown the attorneys were a firm of ability and high personal as well as professional character.

But it is urged that there had been pledged and placed in the hands of Berry $12,000 of Nashville & Decatur bonds, bearing ten per cent interest, and that these bonds were permitted to be sold as part of the estate of A. C. Mayberry, without resistance by the executor or his attorneys, and the lien not asserted, and pledge thereby lost. We proceed to notice this:

The statement of McEwen with reference to Mayberry getting the bonds from Berry is as follows: After saying he wrote the note, that H. G. W. Mayberry signed it as surety, and that Berry was satisfied with this at the time, he adds, but A. C. Mayberry, at the time of the execution of the note, to better satisfy Mr. Berry, handed him a lot of railroad

bonds, about $12,000, I believe, as collateral security, with H. G. W. Mayberry. Some time afterwards the road proposed paying interest upon the bonds. A. C. Mayberry spoke to me about getting the bonds back from Mr. Berry. I do not remember what I told him, but he went out to see the old man, and returned with the bonds and coupons, and A. C. Mayberry collected the coupons and retained the possession of the bonds, and deposited them in the safe of S. S. House, Esq., and retained them while he lived, and after his death his administrator produced the bonds, and returned them in his inventory as part of the assets of A. C. Mayberry's estate, and I think I marked them, or made a note on the inventory, that the bonds had been given as collateral for the Berry debt, but it was claimed Berry had surrendered them to A. C. Mayberry in his lifetime, and it is likely I called Mr. Berry's attention to the matter, and he did not set up any claim to the bonds, and when notice was given, he filed his note himself, and still set up no claim to the bonds. When I asked the chancery court for an order to sell the bonds, I recollect distinctly calling the attention of the court to the *facts* about the bonds, and the court stated that the return of the bonds by Berry to Mayberry, and retention was a cancellation of that part of the contract, and ordered the clerk and master to sell the bonds for the purpose of paying Mayberry's debts, which was done. The bonds were never in my possession or under my control. They were delivered at the time of the loan by A. C. Mayberry

to Bazil Berry himself, and surrendered by himself to Mayberry." He says also, on cross-examination, that he called the attention of the court, at the time the decree was made to sell the bonds, to the memorandum on the inventory.

From all this it appears that Mayberry desired to get the bonds back, not merely temporarily, for there is no intimation of that, but because the railroad was proposing to pay interest on them, that he went to see Berry for this purpose, came back with the bonds and retained possession of them until his death in October, 1868. This must have occurred within a year before his death, as the note is dated September, 1869. Berry died in the latter part of 1871. He permitted these bonds to be retained about four years, while he was prosecuting his claim for his debt, himself filing his claim March, 1870, against the estate of Mayberry, without claiming the benefit of the pledge or any lien on bonds. If it had not been parted with, he would certainly have demanded possession of the pledge from the administrator within that time. Possession was the characteristic of his right as pledgee, and if temporarily parted with only, common prudence demanded it should be resumed, or the right asserted within this period. This is made still stronger, if McEwen, as he says it is likely he did, called his attention to the matter, and he set up no such claim. But it is argued the memorandum made by McEwen on the inventory misled him. It is not shown that he ever saw this. But if he had, then he was notified of his right when he filed his

claim in the chancery court, and not having alluded to it, or made any claim of pledge in his favor, is a strong fact against it, and if such claim had been then asserted by him he would assuredly have made that claim in proper form when he filed his note for allowance and payment. We may add, that while the bill of the administrator filed · for settlement of A. C. Mayberry's estate, referred to Berry's note as one of the debts, it expressly refused to admit the claims referred to as valid, and called on all creditors to file and prove the same. His failure to assert his assumed right as pledgee after this, and permitting his claim to be allowed, with no effort to secure the benefit of the security now assumed to have been pledged for· its payment in an insolvency proceeding to wind up the estate as such, is conclusive against such claim.

It is also urged, that on the margin of inventory made by the administrator, where he refers to and reports these bonds, there is found a note or memorandum, "pledged to B. Berry," and this is true. McEwen, the attorney, shows· that he knew of the fact that the bonds had been so pledged, and added this memorandum to the margin of the inventory when it was returned to the county court. It is not shown, as we have said, that the administrator ever saw it. But while the fact is as stated, and they had been so pledged, this memorandum is only *prima facie* correct, and is subject to explanation, first, as in the case of a note returned in such an inventory as either insolvent or solvent. The facts we have

referred to rebut the statement of the memorandum, and there is nothing to rebut them; assuming them to be true, the pledge had been delivered up by Berry to Mayberry, and this released them from the pledge, nothing more appearing. The other fact that both of the Mayberrys then were men of large estates, and considered amply good for the $5,000, corroborates the view that Berry might well have surrendered the bonds, and not have felt that his debt was in any way endangered thereby. If the claim to the pledgee had been asserted by McEwen with a knowledge of the facts as he gives them, he would have as a witness been compelled to disprove such claim. If he stated all the facts to the court, as he says he did, then the court correctly applied the bonds to payment of all the creditors. It was not his duty to suppress the facts known to him to get a dishonest advantage for his client.

It is urged further, that every other debt against the estate of Mayberry has been paid in full, and only about $5,000, or a few hundred dollars over, has been received on this debt, and this is true. But we cannot see that the executor has been guilty of negligence by which this result has been reached. The case of the insolvent proceedings has been loosely conducted, and no *pro rata* ever declared by the court, nor in fact has any regard been paid to the rules prescribed by our statutes in administering said estate. In fact, it seems very clear that all parties have acquiesced in the notion that the estate would prove sufficient to pay all the debts, and have acted accord-

ingly. The court ordered large sales of property to be made, as the clerk and master reported its necessity, and then the clerk was allowed so pay out the funds as he deemed proper, and report his action to the court, which in every case was confirmed without exception by any creditor or other party. Whatever was done was the action of the court having jurisdiction of the case, and cannot, nothing more appearing, be attributed to the executor as negligence or want of diligence under the facts shown in this record. In addition, it does not as yet appear but that this debt may yet be realized out of the remainder interest in the dower tract of land, and about $1,200 in the hands of the clerk, which is subject to the costs of the case and the Berry debt. The last decree in the case, in 1880, that we find in this record, orders this sold for this purpose; whether done or not is not seen, but we are told in argument it has not been done. It is probable from the proof there will be a deficit from this source, but this cannot be ascertained definitely, nor in fact with any degree of certainty, until this land is actually sold and the proceeds ascertained.

The principle on which an administrator, like any other trustee, is held personally responsible, is want of due diligence in the performance of the duties of his trust, and where he has acted in perfect good faith, as said by this court in the case of *Mickle* v. *Brown*, 4 Baxt., 475, he should not be held to the utmost degree of diligence. See authorities there cited: 3 Will. on Ex'rs, p. 1820.

27—VOL. 14.

M. E. Cator, Executor of Bazil Berry, deceased.

We certainly see not the slightest evidence of bad faith in the conduct of this executor, nor do we see that he has not shown the diligence that would be ordinarily exercised by a prudent man in his own affairs of like kind, and this is all that is required of him. All parties expecting the estate to pay out, there has not been that sharp attention to pressing this claim perhaps that otherwise might have been the case, but that the attorneys, or any one else, have been guilty of such negligence as to render them liable, we cannot say from what we see in this record.

It is urged, however, that H. G. W. Mayberry was joint maker of the note, and was solvent for some years after the death of his brother. But from what we have seen, it is clear he was legally released as surety, and could have made good his defense on the facts shown, by reason of the collaterals having been surrendered by Berry, which were ample to have indemnified him. That he was surety is abundantly proved: 1 Lea, 488; *Allen* v. *Henley*, 2 Lea, 143; 3 Lea, 668; *Ibid*, 215.

This being true, it would not be required that the executor should bring suit against the surety, and he certainly cannot be held responsible for non-collection of a debt, which, if he had resorted to legal process to enforce, he could not have been successful. There has been no loss to the estate by this, and therefore no responsibility.

The result is, the report of the Referees is approved, and judgment of the court below reversed, with costs.